1

2

3

4                                    **UNITED STATES DISTRICT COURT**

5                                          **DISTRICT OF NEVADA**

6

7    WINNEMUCCA INDIAN COLONY et al.,              )
                                                   )
          Plaintiffs,                              )
8                                                  )
                                                   )
9         vs.                                      )              3:11-cv-00622-RCJ-VPC
                                                   )
10   UNITED STATES OF AMERICA ex rel.              )                  **ORDER**
     DEPARTMENT OF THE INTERIOR et al.,            )
                                                   )
11        Defendants.                              )
     _____       )
12

13        This case arises out of the refusal of the U.S. Department of the Interior ("DOI") to

14   recognize the current tribal government of the Winnemucca Indian Colony (the "Colony") and

15   the interference of the Bureau of Indian Affairs ("BIA") with the Colony's activities on its own

16   land.  Pending before the Court are motions for a temporary restraining order and for a

17   preliminary injunction.  For the reasons given herein, the Court grants the motion for temporary

18   restraining order in part.

19   **I.       FACTS AND PROCEDURAL HISTORY**

20            **A.       Tribal Recognition**

21            In 1972, the Colony adopted a constitution pursuant to the Indian Reorganization Act.

22   (Compl. ¶ 1, Aug. 29, 2011, ECF No. 1).  In 1986, the Western Nevada Agency of the BIA

23   ("WNA") took control of the Colony's assets and withdrew its recognition of the colonial

24   government, (*id.* ¶ 2), but by 1990 the BIA had recognized a colonial government and returned

25   the Colony's assets, (*id.* ¶ 3).  That government consisted of Chairman Glenn Wasson and

Council Members Elverine Castro, Lucy Lowery, Thomas Wasson, and a fifth council member, whose position was held by four different persons between 1990 and 2000, including William Bills. (*See id.* ¶ 4).

At a February 2000 council meeting, Chairman Glenn Wasson reported to the Council that Vice Chairman and Council Member William Bills might not qualify as an Indian because of his adoption, and that he was interfering with colonial mail. (*See id.* ¶ 5). On February 22, 2000, Chairman Glenn Wasson was stabbed to death on the steps of the Colonial Administration Building, and the United States has not yet arrested anyone for the murder. (*Id.* ¶ 6). Thomas Wasson ("Wasson") and Bills both claimed the chairmanship: Bills because he was the Vice Chairman, and Wasson because he alleged (and reported to the WNA) that Bills was not an Indian under colonial rules. (*See id.* ¶ 7). The WNA declared the Colony to be dysfunctional and refused to recognize any colonial government in July 2000. (*Id.* ¶ 8). In December 2000, the Western Regional Office ("WRO")—which manages Nevada, Arizona, and Utah—overruled the WNA, but the BIA has still not recognized any colonial government. (*See id.* ¶¶ 9–10).

On August 16, 2002 a panel of judges convened and ruled that Wasson was the Chairman of the Colonial Council. (*Id.* ¶ 11). The Inter-Tribal Court of Appeals of Nevada dismissed all appeals on May 17, 2007. (*Id.* ¶ 12). In a federal interpleader action filed by Bank of America in this District to determine which faction (the Wasson faction or the Bills faction) had the right to use a colonial bank account, *see Bank of America v. Bills*, No. 3:00-cv-450, Judge Brian E. Sandoval ruled that the parties had exhausted their tribal remedies, that a federal court must enforce tribal court orders under ordinary principles of comity, and that the order of a special panel of tribal judges (the "Minnesota Panel") to which the parties had stipulated controlled. (*See* Sandoval Summ. J. Order 8–9, Mar. 6, 2008, ECF No. 7-1).[1] That case was reassigned to this

---

[1]The procedural history is actually more complex than reported by Plaintiffs and is fully recounted in Judge Sandoval's order. (*See* Sandoval Summ. J. Order 2–3). Bills first filed for

1   Court, and the Ninth Circuit affirmed in an unpublished opinion captioned as *Bank of America v.*

2   *Swanson*. (*See* Mem. Op., Oct. 14, 2010, ECF No. 7-3).  The Supreme Court denied certiorari on

3   April 18, 2011. (*See* Notice, Apr. 18, 2011, ECF No. 253 in Case No. 3:00-cv-450).

4       **B.**     **BIA Encroachment**

5        In May 2011, members of the Colony began rehabilitating a smoke shop within the

6   Colony that was abandoned when Glenn Wasson was murdered. (Compl. ¶ 15).  On July 31,

7   2011, BIA police officers told several contractors who had been hired by Wasson to help repair

8   the smoke shop that they would have to leave the land by the next morning or face arrest. (*Id.* ¶¶

9   16–17).  The officers also failed to eject other persons from the Colony who did not have the

10   right to be there. (*Id.* ¶ 18).  The Superintendent of the WNA has not responded to Wasson's

11   request to permit Colony members to return to Colony lands. (*Id.* ¶ 20).

12       **C.**     **The Present Lawsuit**

13        The Colony and Wasson sued the United States of America *ex rel.* DOI, BIA, and the

14   unnamed Superintendent of the WNA in this Court on two causes of action: (1) injunctive relief

15   preventing the BIA from interfering with contractors Wasson has directed to perform work

16   within the Colony; and (2) declaratory relief as to the identity of legitimate colonial officials.

17   The claim for declaratory relief, however, asks the Court not only to declare a fact but to issue a

18   command. (*See* Compl. ¶ 44) ("Plaintiffs request that this Court declare that the United States

19   *must recognize* the government of the Winnemucca Indian Colony as Thomas Wasson,

20

21   emergency injunctive relief in the Winnemucca Tribal Court, and that court granted him relief,
declaring him to be the Acting Chairman.  The Inter-Tribal Court of Appeals of Nevada ordered

22   a trial on the matter, and the pro tem judge appointed to try the case ruled that there was no
legitimately formed colonial government and that an election must be held.  The parties agreed

23   instead to submit their cross-appeals to a special panel of judges from the Sioux Nation (the
Minnesota Panel) for a binding, non-appealable decision.  The Minnesota Panel ruled in favor of

24   Wasson, and this appears to be the August 16, 2002 decision to which Plaintiffs refer.  The May

25   17, 2007 decision by the Inter-Tribal Court of Appeals of Nevada represents that court's ruling
that it had no jurisdiction to consider any appeal from the Minnesota Panel's ruling.

1   Chairman, Judy Rojo, Katehrine Halsbruck, Misty Morning Dawn Rojo and Eric Magiera as the

2   official and serving Council of the Winnemucca Indian Colony . . . ." (emphasis added)).

3   Plaintiffs have moved for a temporary restraining order and preliminary injunction granting

4   interim relief as to the first cause of action.

5   **II.    LEGAL STANDARDS**

6        Under Fed. R. Civ. P. 65(b), a plaintiff must make a showing that immediate and

7   irreparable injury, loss, or damage will result to plaintiff without a temporary restraining order.

8   Temporary restraining orders are governed by the same standard applicable to preliminary

9   injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d

10  1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as

11  the standard for issuing a temporary restraining order."). The standard for obtaining *ex parte*

12  relief under Rule 65 is very stringent. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130

13  (9th Cir. 2006). The temporary restraining order "should be restricted to serving [its] underlying

14  purpose of preserving the status quo and preventing irreparable harm just so long as is necessary

15  to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck*

16  *Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

17       The Ninth Circuit in the past set forth two separate sets of criteria for determining

18  whether to grant preliminary injunctive relief:

19       Under the traditional test, a plaintiff must show: (1) a strong likelihood of success
20       on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary
         relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4)
21       advancement of the public interest (in certain cases). The alternative test requires
         that a plaintiff demonstrate either a combination of probable success on the merits
22       and the possibility of irreparable injury or that serious questions are raised and the
         balance of hardships tips sharply in his favor.

23  *Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). "These two formulations represent two

24  points on a sliding scale in which the required degree of irreparable harm increases as the

25  probability of success decreases." *Id.*

The Supreme Court recently reiterated, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 129 S. Ct. 365, 374–76 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test). The Ninth Circuit has explicitly recognized that its "possibility" test was "definitively refuted" in *Winter*, and that "[t]he proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 129 S. Ct. at 374) (reversing a district court's use of the Ninth Circuit's pre-Winter, "sliding-scale" standard and remanding for application of the proper standard).

A recent Ninth Circuit ruling relying largely on the dissenting opinion in *Winter* parsed the language of *Winter* and subsequent Ninth Circuit rulings and determined that the sliding scale test remains viable when there is a lesser showing of likelihood of success on the merits amounting to "serious questions," but not when there is a lesser showing of likelihood of irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  This case presents some difficulty in light of *Winter* and prior Ninth Circuit cases.  To the extent *Cottrell*'s interpretation of *Winter* is inconsistent with *Selecky*, *Selecky* controls. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that, in the absence of an intervening Supreme Court decision, only the en banc court may overrule a decision by a three-judge panel).  In any case, the Supreme Court stated in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is *likely* to succeed on the merits, that he is *likely* to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374 (citing *Munaf v. Geren*, 128 S. Ct. 2207, 2218–19 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)) (emphases added).  The

1    test is presented as a four-part conjunctive test, not as a four-factor balancing test, and the word

2    "likely" modifies the success-on-the-merits prong in exactly the same way it separately modifies

3    the irreparable-harm prong.  In rejecting the sliding-scale test, the *Winter* Court specifically

4    emphasized the fact that the word "likely" modifies the irreparable-injury prong, *see id.* at 375,

5    and the word modifies the success-on-the-merits prong the same way, *id.* at 374.  In dissent,

6    Justice Ginsburg opined that she did not believe the Court was abandoning the rule that it was

7    permissible to "award[ preliminary injunctive] relief based on a lower likelihood of harm when

8    the likelihood of success is very high." *Id.* at 392 (Ginsburg, J., dissenting).  But Justice

9    Ginsburg, like the majority, did not address whether she believed relief could be granted when

10   the chance of success was *less than* likely.  A "lower likelihood" is still *some* likelihood.  We are

11   left with the language of the test, which requires the chance of success on the merits to be at least

12   "likely."

13         In summary, to satisfy *Winter*, a movant must show that he is "likely" to succeed on the

14   merits.  "Likely" means "having a high probability of occurring or being true."

15   Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/likely.  Black's

16   defines the "likelihood-of-success-on-the-merits test" more leniently as "[t]he rule that a litigant

17   who seeks [preliminary relief] must show a reasonable probability of success . . . ." *Black's Law*

18   *Dictionary* 1012 (9th ed. 2009).  The Court must reconcile the cases by interpreting the *Cottrell*

19   "serious questions" requirement to be in harmony with the *Winter*/*Selecky* "likelihood" standard,

20   not as being in competition with it.  "Serious questions going to the merits" must mean that there

21   is at least a reasonable probability of success on the merits.  "Reasonable probability" appears to

22   be the most lenient position on the sliding scale that can satisfy the requirement that success be

23   "likely."

24   **III.    ANALYSIS**

25         Congress has plenary power over the Indian tribes, *see, e.g.*, *Lone Wolf v. Hitchcock*, 187

U.S. 553, 565 (1903), which under American law exist as "domestic dependent nations," *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831).  As a starting point in American history, Indian tribes existed as sovereign nations. *Id.* at 59–60.  However, the tribes' sovereignty has been "necessarily diminished" via conquest by other sovereigns, such as England, France, Holland, Spain, and Portugal, all of whom recognized the principle that a conquered people retained the right to occupy the land, but that certain aspects of sovereignty became forfeit. *Johnson v. McIntosh*, 21 U.S. 543, 574–76 (1823).  Congressionally recognized tribes retain all aspects of sovereignty they enjoyed as independent nations before they were conquered, with three exceptions: (1) they may not engage in foreign commerce or other foreign relations, *see Worcester v. Georgia*, 31 U.S. 515, 559 (1832); (2) they may not alienate fee simple title to tribal land without the permission of Congress, *see McIntosh*, 21 U.S. at 574; and (3) Congress may strip a tribe of any other aspect of sovereignty at its pleasure, *see Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208 (1978), *superseded on other grounds by* 25 U.S.C. § 1301(2), (4) (1990).  In summary, any aspect of sovereignty consistent with a tribe's dependent status, and which has not been taken away by Congress, remains with the tribe.

Congress has delegated to the Commissioner of Indian Affairs (head of BIA), through the Secretary of the Interior (head of DOI), the task of recognizing Indian tribes, and it has authorized the President to promulgate applicable regulations through these agencies. *See* 25 U.S.C. §§ 2, 9; 25 C.F.R. § 83.2.  The BIA last published its list of federally recognized tribes on October 1, 2010. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 75 Fed. Reg. 60,810 (Oct. 1, 2010).  The "Winnemucca Indian Colony of Nevada" is listed therein. *See id.* at 60,813.

### A.     Standing

As a preliminary matter, although the Complaint has been brought in the name of the Colony, because recognition of the colonial government is precisely what is in dispute, the Court

1   will look only to the individual Plaintiff, Wasson, to determine standing.  He purports to be the

2   Chairman of the Colonial Council.  Wasson therefore clearly has standing to bring the present

3   Complaint insofar as he asks the Court to declare him to be the Chairman.  Because that fact is

4   itself in dispute, the Colony itself may not yet be a proper Plaintiff.  The Court will therefore not

5   enter any orders, preliminary or otherwise, concerning the claim about the BIA's activities on

6   colonial land unless and until the BIA in fact recognizes Wasson as the Chairman, at least in the

7   interim.  Until the BIA recognizes Wasson (or some other person or persons) as the legitimate

8   colonial representative(s), no party has standing to ask the Court to prescribe or proscribe BIA

9   activities on colonial land.

10          **B.       Recognition of the Colonial Government**

11          Plaintiffs first argue that because the Colony is a federally recognized tribe, Defendants

12   must recognize certain persons as constituting the legitimate colonial government.  There is

13   appellate case law on point from the Eighth Circuit.  A district court has jurisdiction under 28

14   U.S.C. § 1331 and 5 U.S.C. § 706(2)(A) to grant declaratory and injunctive relief to Indians

15   demanding that the BIA recognize a certain tribal government under the "arbitrary and

16   capricious" standard of the Administrative Procedures Act ("APA").  *Goodface v. Grassrope*,

17   708 F.2d 335, 337–38 (8th Cir. 1983).  Although purely intra-tribal cases (where litigants dispute

18   the results of a tribal election between themselves) do not give rise to federal jurisdiction, where

19   litigants sue a federal agency such as the BIA to demand recognition under a tribal constitution,

20   a federal court has jurisdiction under the APA, so long as no statute precludes judicial review.

21   *See id.* at 338 & n.4.  "The final BIA action subject to judicial review is its decision to recognize

22   [certain tribal officials or not]." *Id.* at 338.  The *Goodface* court ruled that the BIA abused its

23   discretion when it refused to make any attempt to sort out the disputed election, but rather chose

24   to ignore both purported tribal councils indefinitely until the tribe sorted out the matter for itself.

25   *See id.* at 339.  The Court held that where tribal leadership is in dispute, the BIA abuses its

1    discretion under the APA by failing to take sides until the tribe sorts out the dispute internally.

2    *See id.* ("We commend the BIA for its reluctance to intervene in the election dispute, but it was

3    an abuse of discretion for the BIA to refuse to recognize one council or the other until such time

4    as Indian contestants could resolve the dispute themselves."); *accord Attorney's Process &*

5    *Investigative Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 943 (8th Cir. 2010)

6    (citing *id.*).  Still, a district court should not address the merits of a tribal election dispute, so

7    long as there is a functional tribal court that can sort out the dispute internally. *See Goodface*,

8    708 F.2d at 339 ("Although it was necessary to remedy the situation by ordering the BIA to

9    recognize one governing body, the district court overstepped the boundaries of its jurisdiction in

10   interpreting the tribal constitution and bylaws and addressing the merits of the election

11   dispute."); *accord Sac & Fox Tribe*, 609 F.3d at 943 (citing *id.*).  Where there is no functional

12   tribal court, and the dispute is in danger of never being sorted out internally within the tribe, the

13   BIA, and then a federal district court, may have to address the merits of the dispute in order to

14   afford relief. *See Wheeler v. BIA*, 811 F.2d 549, 553 (10th Cir. 1987) (citing *Goodface*, 708 F.2d

15   at 339; *Milam v. U.S. Dep't of Interior*, 10 Indian L. Rep. 3013, No. 82-3099 (D.D.C. Dec. 23,

16   1982)).

17        Here, the Court will issue a temporary restraining order requiring the BIA within a

18   reasonable period of time to grant interim recognition to some person(s) or body of persons as

19   the Colony's sovereign representative having authority to treat with the United States and

20   manage federal benefits on behalf of the Colony and its members.  The Court will then consider

21   issuing a preliminary injunction until such time as the highest court of the Colony can sort out

22   the dispute, at which point the BIA will presumably recognize whichever parties the tribal court

23   system declares to be the tribal leaders.

24        In this case, it appears that functional tribal courts have in fact determined a previous

25   dispute to exhaustion, i.e., the litigation resulting in final adjudication by the Minnesota Panel,

1   and the federal courts have honored that determination.  The previous dispute is therefore

2   precluded from relitigation, and the BIA had no choice but to recognize those tribal leaders in

3   whose favor the Minnesota Panel ruled.  But the fact that the decision of the Minnesota Panel is

4   precluded from relitigation does not necessarily mean that there in no dispute before the Court

5   today.  The Minnesota Panel ruled in 2002 that the Council consisted of Thomas Wasson,

6   William Bills, Sharon Wasson, Elverine Castro, and Thomas Magiera (until his death), and it

7   ordered that the Council appoint a fifth member within thirty days and hold new elections within

8   six months of October 2002. *See Wasson v. Bills* at 19, ECF No. 7-2.  Plaintiffs ask the Court to

9   rule that today the Council consists of Thomas Wasson, Judy Rojo, Katehrine Halsbruck, Misty

10  Morning Dawn Rojo and Eric Magiera.  This conclusion does not necessarily flow from the

11  Minnesota Panel's ruling.  The disparity between the ruling of the Minnesota Panel and the

12  declaration Plaintiffs seek is almost certainly accounted for by intervening elections and other

13  occurrences.  That is, the present controversy appears to arise at least in part out of intervening,

14  post-2002 disputes the tribal courts have never addressed.  The Court will therefore issue a

15  temporary restraining order requiring the BIA within a reasonable period of time to grant interim

16  recognition to some persons or body of persons as the Colony's government until such time as

17  the highest court of the Colony can sort out the dispute, at which point the BIA will presumably

18  finally recognize whichever parties the tribal court system declares to be the tribal leaders.

19          **C.    Encroachment onto Colony Land**

20          Plaintiffs also argue that BIA agents may not encroach on Colony land.  Specifically,

21  they complain that certain BIA agents ejected contractors from the Colony's smoke shop who

22  were renovating the structure on behalf of the Colony, and that the BIA has failed to eject other

23  persons from the land that the Colony wishes to have ejected.  The Court will issue no order on

24  this claim until the BIA has determined to which person(s) it will grant interim recognition.

25  Only at that time can the will of the Colony be reckoned.

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the Motion for Temporary Restraining Order (ECF No.

3    7) is GRANTED in part and DENIED in part.

4          IT IS FURTHER ORDERED that the BIA must give interim recognition to some person

5    or body of persons as the legitimate representative(s) of the Winnemucca Indian Colony of

6    Nevada and manifest its decision by notice in the docket no later than 5:00 p.m. PDT on

7    September 7, 2011.  The Colony suffers irreparable injury every day it is deprived of services

8    and opportunities to which it is otherwise entitled as a federally recognized Indian nation,

9    including the ability to engage in self-sustaining economic activity on colonial land.  The BIA's

10   prolonged refusal to treat with the Colony amounts to a de facto termination of the sovereign

11   recognition the Colony has been granted by Congress, which is likely to lead to the irreparable

12   political dissolution of the Colony's sovereign existence.

13         IT IS FURTHER ORDERED that the Motion for Preliminary Injunction (ECF No. 8)

14   will be heard in Reno Courtroom 6 on the stacked 9:00 a.m. calender on September 12, 2011.

15         IT IS FURTHER ORDERED that this order expires at 12:00 p.m. PDT on September 13,

16   2011.

17         IT IS SO ORDERED.

18         Dated this 31st day of August, 2011 at 3:45 p.m. PDT.

19

20   _____
                    ROBERT C. JONES
21                  United States District Judge

22

23

24

25