1
2
3
4                          **UNITED STATES DISTRICT COURT**
5                              **DISTRICT OF NEVADA**
6
7    WINNEMUCCA INDIAN COLONY et al.,        )
                                              )
          Plaintiffs,                         )
8                                             )
9         vs.                                 )        3:11-cv-00622-RCJ-VPC
                                              )
10   UNITED STATES OF AMERICA ex rel.         )              **ORDER**
     DEPARTMENT OF THE INTERIOR et al.,       )
                                              )
11        Defendants.                         )
                                              )
12   _____  )
13
14          This case arises out of the refusal of the U.S. Department of the Interior ("DOI") to
15   recognize the current tribal government of the Winnemucca Indian Colony (the "Colony") and
16   the interference of the Bureau of Indian Affairs ("BIA") with the Colony's activities on its own
17   land.  The Court issued a Temporary Restraining Order ("TRO") ordering the BIA to grant
18   interim recognition to some person or persons but not ordering or restraining any BIA activity on
19   Colony land.  Pending before the Court are motions for a preliminary injunction and to vacate
20   the TRO.  For the reasons given herein, the Court grants the motion for preliminary injunction in
     part and denies the motion to vacate.

21   **I.      FACTS AND PROCEDURAL HISTORY**

22          **A.     Tribal Recognition**

23          In 1972, the Colony adopted a constitution pursuant to the Indian Reorganization Act.
24   (Compl. ¶ 1, Aug. 29, 2011, ECF No. 1).  In 1986, the Western Nevada Agency of the BIA
25   ("WNA") took control of the Colony's assets and withdrew its recognition of the colonial

government, (*id.* ¶ 2), but by 1990 the BIA had recognized the Council and returned the Colony's assets, (*id.* ¶ 3).  That Council consisted of Chairman Glenn Wasson and Members Elverine Castro, Lucy Lowery, Thomas Wasson, and a fifth council member, whose position was held by four different persons between 1990 and 2000, including William Bills. (*See id.* ¶ 4).

At a February 2000 council meeting, Chairman Glenn Wasson reported to the Council that Vice Chairman William Bills might not qualify as an Indian under the tribal constitution because of his adoption, and that he was interfering with colonial mail. (*See id.* ¶ 5).  On February 22, 2000, Chairman Glenn Wasson was stabbed to death on the steps of the Colonial Administration Building, and the United States has not yet arrested anyone for the murder. (*Id.* ¶ 6).  Glenn Wasson's son, Thomas R. Wasson ("Wasson"), and Bills both claimed the chairmanship: Bills because he was the Vice Chairman, and Wasson because he alleged (and reported to the WNA) that Bills was not an Indian eligible for membership on the Council or even membership in the Colony. (*See id.* ¶ 7).  The WNA declared the Colony to be dysfunctional and refused to recognize any colonial government in July 2000. (*Id.* ¶ 8).  In December 2000, the Western Regional Office ("WRO")—which manages Nevada, Arizona, and Utah—overruled the WNA, but the BIA has still not recognized any colonial government. (*See id.* ¶¶ 9–10).

On August 16, 2002 a panel of judges convened and ruled that Wasson was the Chairman of the Colonial Council. (*Id.* ¶ 11).  The Inter-Tribal Court of Appeals of Nevada dismissed all appeals on May 17, 2007. (*Id.* ¶ 12).  In a federal interpleader action filed by Bank of America in this District to determine which faction (the Wasson faction or the Bills faction) had the right to use a colonial bank account, *see Bank of America v. Bills*, No. 3:00-cv-450, Judge Brian E. Sandoval ruled that the parties had exhausted their tribal remedies, that a federal court must enforce tribal court orders under ordinary principles of comity, and that the order of a special panel of tribal judges (the "Minnesota Panel") to which the parties had stipulated controlled. (*See*

1  Sandoval Summ. J. Order 8–9, Mar. 6, 2008, ECF No. 7-1).[1]  That case was reassigned to this

2  Court upon Judge Sandoval's resignation, and the Ninth Circuit affirmed in an unpublished

3  opinion captioned as *Bank of America v. Swanson*. (*See* Mem. Op., Oct. 14, 2010, ECF No. 7-

4  3).[2]  The Supreme Court denied certiorari on April 18, 2011. (*See* Notice, Apr. 18, 2011, ECF

5  No. 253 in Case No. 3:00-cv-450).[3]

6      **B.    BIA Encroachment**

7      In May 2011, members of the Colony began rehabilitating a smoke shop within the

8  Colony that was abandoned when Glenn Wasson was murdered. (Compl. ¶ 15).  On July 31,

9  2011, BIA police officers told several contractors hired by Wasson to help repair the smoke shop

10  that they would have to leave the land by the next morning or they would be arrested.

11

12

13  _____

14      [1]The procedural history is actually more complex than reported by Plaintiffs and is fully
recounted in Judge Sandoval's order. (*See* Sandoval Summ. J. Order 2–3).  When the leadership

15  dispute first arose, Bills filed for emergency injunctive relief in the Winnemucca Tribal Court,
and that court declared him to be the acting Chairman.  The Inter-Tribal Court of Appeals of

16  Nevada ordered a trial on the matter, and the pro tem judge appointed to try the case ruled
that there was no legitimately formed colonial government and that an election must be held.  The

17  parties agreed to submit their cross-appeals to a special panel of judges from the Sioux Nation
(the Minnesota Panel) for a binding, non-appealable decision.  The Minnesota Panel ruled in

18  favor of Wasson, and this appears to be the August 16, 2002 decision to which Plaintiffs refer.
The May 17, 2007 decision by the Inter-Tribal Court of Appeals of Nevada represents that

19  court's ruling that it had no jurisdiction to consider an appeal from the Minnesota Panel.

20      [2]The case was originally assigned to Judge Howard D. McKibben before Judge Sandoval.

21      [3]At oral argument, the BIA argued that because it was not party to the *Bank of America*

22  case, the issue of the leadership dispute is not precluded with respect to the BIA's own
administrative adjudication.  But this is a legal point with little practical significance in the

23  present case.  Although the decision may not be directly binding on the BIA under ordinary
principles of issue preclusion, it certainly binds the parties to the dispute, so it is difficult to see

24  how the BIA could permit the losing parties to argue in the BIA forum against the preclusive
effect of the Minnesota Panel's rulings without abusing its discretion.  In this sense, the BIA may

25  be practically restricted in its options in the present case just as if it were legally bound by the
Minnesota Panel's decision directly.

1   (*Id.* ¶¶ 16–17).[4]  The officers also failed to eject other persons from the Colony who did not have

2   the right to be there. (*Id.* ¶ 18).  The Superintendent of the WNA has not responded to Wasson's

3   request to permit Colony members to return to the Colony lands. (*Id.* ¶ 20).

4       **C.    The Present Lawsuit**

5       Plaintiffs the Colony and Wasson have sued the United States of America *ex rel.* DOI,

6   BIA, and the unnamed Superintendent of the WNA in this Court on two causes of action: (1)

7   injunctive relief preventing the BIA from interfering with contractors Wasson has directed to

8   perform work within the Colony; and (2) declaratory relief as to the identity of legitimate

9   Colonial officials.  The claim for declaratory relief, however, asks the Court not only to declare a

10  fact but to issue a command. (*See* Compl. ¶ 44) ("Plaintiffs request that this Court declare that

11  the United States *must recognize* the government of the Winnemucca Indian Colony as Thomas

12  Wasson, Chairman, Judy Rojo, Katehrine Halsbruck, Misty Morning Dawn Rojo and Eric

13  Magiera as the official and serving Council of the Winnemucca Indian Colony . . . ." (emphasis

14  added)).  Plaintiffs moved for a TRO and preliminary injunction granting interim relief as to the

15  first cause of action.  The Court issued a TRO ordering the BIA to recognize a person or persons

16  in the interim as the legitimate representative(s) of the Colony and scheduled the present

17  preliminary injunction hearing.  The BIA has also moved to vacate the TRO.

18  **II.    LEGAL STANDARDS**

19      Under Fed. R. Civ. P. 65(b), a plaintiff must make a showing that immediate and

20  irreparable injury, loss, or damage will result to plaintiff without a temporary restraining order.

21  _____

22      [4]The BIA argues that the BIA officers did not force any persons to leave the Colony's
    land or arrest them.  However, it is undisputed that the officers told Wasson's contractors that
23  they were not authorized to be on the land even after speaking directly to Wasson on the
    telephone in their presence.  Under such circumstances, no reasonable person would expect he
24  could have ignored the BIA officers and continued working on the land without risking arrest for
    trespass, so the argument that the workers were not forced off the land because the officers did
25  not use the word "leave" or arrest them is weak.

Temporary restraining orders are governed by the same standard applicable to preliminary injunctions. *See Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order."). The standard for obtaining *ex parte* relief under Rule 65 is very stringent. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006). The temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

The Ninth Circuit in the past set forth two separate sets of criteria for determining whether to grant preliminary injunctive relief:

> Under the traditional test, a plaintiff must show: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). The alternative test requires that a plaintiff demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

*Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.*

The Supreme Court recently reiterated, however, that a plaintiff seeking an injunction must demonstrate that irreparable harm is "likely," not just possible. *Winter v. NRDC*, 129 S. Ct. 365, 374–76 (2008) (rejecting the Ninth Circuit's alternative "sliding scale" test). The Ninth Circuit has explicitly recognized that its "possibility" test was "definitively refuted" in *Winter*, and that "[t]he proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

1    injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir.

2    2009) (quoting *Winter*, 129 S. Ct. at 374) (reversing a district court's use of the Ninth Circuit's

3    pre-*Winter*, "sliding-scale" standard and remanding for application of the proper standard).

4        A recent Ninth Circuit ruling relying largely on the dissenting opinion in *Winter* parsed

5    the language of *Winter* and subsequent Ninth Circuit rulings and determined that the sliding

6    scale test remains viable when there is a lesser showing of likelihood of success on the merits

7    amounting to "serious questions," but not when there is a lesser showing of likelihood of

8    irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir.

9    2011).  This case presents some difficulty in light of *Winter* and prior Ninth Circuit cases.  To

10   the extent *Cottrell*'s interpretation of *Winter* is inconsistent with *Selecky*, *Selecky* controls. *Miller*

11   *v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) (holding that, in the absence of an

12   intervening Supreme Court decision, only the en banc court may overrule a decision by a

13   three-judge panel).  In any case, the Supreme Court stated in *Winter* that "[a] plaintiff seeking a

14   preliminary injunction must establish that he is *likely* to succeed on the merits, that he is *likely* to

15   suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

16   favor, *and* that an injunction is in the public interest." *Winter*, 129 S. Ct. at 374 (citing *Munaf v.*

17   *Geren*, 128 S. Ct. 2207, 2218–19 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542

18   (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)) (emphases added).  The

19   test is presented as a four-part conjunctive test, not as a four-factor balancing test, and the word

20   "likely" modifies the success-on-the-merits prong in exactly the same way it separately modifies

21   the irreparable-harm prong.  In rejecting the sliding-scale test, the *Winter* Court specifically

22   emphasized the fact that the word "likely" modifies the irreparable-injury prong, *see id.* at 375,

23   and the word modifies the success-on-the-merits prong the same way, *id.* at 374.  In dissent,

24   Justice Ginsburg opined that she did not believe the Court was abandoning the rule that it was

25   permissible to "award[ preliminary injunctive] relief based on a lower likelihood of harm when

1   the likelihood of success is very high." *Id.* at 392 (Ginsburg, J., dissenting).  But Justice

2   Ginsburg, like the majority, did not address whether she believed relief could be granted when

3   the chance of success was *less than* likely.  A "lower likelihood" is still *some* likelihood.  We are

4   left with the language of the test, which requires the chance of success on the merits to be at least

5   "likely."

6       In summary, to satisfy *Winter*, a movant must show that he is "likely" to succeed on the

7   merits.  "Likely" means "having a high probability of occurring or being true."

8   Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/likely.  Black's

9   defines the "likelihood-of-success-on-the-merits test" more leniently as "[t]he rule that a litigant

10  who seeks [preliminary relief] must show a reasonable probability of success . . . ." *Black's Law*

11  *Dictionary* 1012 (9th ed. 2009).  The Court must reconcile the cases by interpreting the *Cottrell*

12  "serious questions" requirement to be in harmony with the *Winter/Selecky* "likelihood" standard,

13  not as being in competition with it.  "Serious questions going to the merits" must mean that there

14  is at least a reasonable probability of success on the merits.  "Reasonable probability" appears to

15  be the most lenient position on the sliding scale that can satisfy the requirement that success be

16  "likely."

17  **III.    ANALYSIS**

18      Congress has plenary power over the Indian tribes, *see, e.g.*, *Lone Wolf v. Hitchcock*, 187

19  U.S. 553, 565 (1903), which under American law exist as "domestic dependent nations,"

20  *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831).  As a starting point in American history,

21  tribes existed as sovereign nations. *Id.* at 59–60.  However, the tribes' sovereignty has been

22  "necessarily diminished" via conquest by other sovereigns, such as England, France, Holland,

23  Spain, and Portugal, all of whom recognized the principal that a conquered people retained the

24  right to occupy the land, but that certain aspects of sovereignty became forfeit. *Johnson v.*

25  *McIntosh*, 21 U.S. 543, 574–76 (1823).  Congressionally recognized tribes retain all aspects of

1     sovereignty they enjoyed as independent nations before they were conquered, with three

2     exceptions: (1) they may not engage in foreign commerce or other foreign relations, *see*

3     *Worcester v. Georgia*, 31 U.S. 515, 559 (1832); (2) they may not alienate fee simple title to tribal

4     land without the permission of Congress, *see McIntosh*, 21 U.S. at 574; and (3) Congress may

5     strip a tribe of any other aspect of sovereignty at its pleasure, *see Oliphant v. Suquamish Indian*

6     *Tribe*, 435 U.S. 191, 208 (1978), *superseded on other grounds by* 25 U.S.C. § 1301(2), (4)

7     (1990).  In summary, any aspects of sovereignty consistent with the tribes' dependent status, and

8     which have not been taken away by Congress, remain with the tribes.

9          Congress has delegated to the Commissioner of Indian Affairs (head of the BIA), through

10     the Secretary of the Interior (head of the DOI), the task of recognizing Indian tribes, and it has

11     authorized the President to promulgate applicable regulations through these agencies. *See* 25

12     U.S.C. §§ 2, 9; 25 C.F.R. § 83.2.  The BIA last published its list of federally recognized tribes on

13     October 1, 2010. *See* Indian Entities Recognized and Eligible to Receive Services from the

14     United States Bureau of Indian Affairs, 75 Fed. Reg. 60,810 (Oct. 1, 2010).  The "Winnemucca

15     Indian Colony of Nevada" is listed therein. *See id.* at 60,813.

16          Plaintiffs first argue that because the Colony is a federally recognized tribe, Defendants

17     must recognize certain persons as constituting the legitimate colonial government.  There is

18     appellate case law on point from the Eighth Circuit.  A district court has jurisdiction under 28

19     U.S.C. § 1331 and 5 U.S.C. § 706(2)(A) to grant declaratory and injunctive relief to Indians

20     demanding that the BIA recognize a certain tribal government under the "arbitrary and

21     capricious" standard of the Administrative Procedures Act ("APA"). *Goodface v. Grassrope*,

22     708 F.2d 335, 337–38 (8th Cir. 1983).  Although purely intra-tribal cases where litigants dispute

23     the results of a tribal election between themselves do not give rise to federal jurisdiction, where

24     litigants sue a federal agency such as the BIA to demand recognition under a tribal constitution,

25     a federal court has jurisdiction under the APA, so long as no statute precludes judicial review.

1   *See id.* at 338 & n.4.  "The final BIA action subject to judicial review is its decision to recognize

2   [certain tribal officials or not]." *Id.* at 338.  The *Goodface* court ruled that the BIA abused its

3   discretion when it refused to make any attempt to sort out the disputed election, but rather chose

4   essentially to ignore both purported tribal councils indefinitely—by "recognizing" both of them

5   equally on a de facto basis—until the tribe sorted out the matter for itself. *See id.* at 339.  The

6   Court held that where tribal leadership is in dispute, the BIA abuses its discretion under the APA

7   by failing to take sides until the tribe sorts out the dispute internally. *See id.* ("We commend the

8   BIA for its reluctance to intervene in the election dispute, but it was an abuse of discretion for

9   the BIA to refuse to recognize one council or the other until such time as Indian contestants

10  could resolve the dispute themselves."); *accord Attorney's Process & Investigative Servs., Inc. v.*

11  *Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 943 (8th Cir. 2010) (citing *id.*).  Still, a federal

12  agency or court should not address the merits of a tribal election dispute, so long as there is a

13  functional tribal court that can sort out the dispute internally. *See Goodface*, 708 F.2d at 339

14  ("Although it was necessary to remedy the situation by ordering the BIA to recognize one

15  governing body, the district court overstepped the boundaries of its jurisdiction in interpreting

16  the tribal constitution and bylaws and addressing the merits of the election dispute."); *accord Sac*

17  *& Fox Tribe*, 609 F.3d at 943 (citing *id.*).  Where there is no functional tribal court, and the

18  dispute is in danger never of being sorted out internally within the tribe, the BIA, and then a

19  federal district court, may have to address the merits of the dispute. *See Wheeler v. BIA*, 811 F.2d

20  549, 553 (10th Cir. 1987) (citing *Goodface*, 708 F.2d at 339; *Milam v. U.S. Dep't of Interior*, 10

21  Indian L. Rep. 3013, No. 82-3099 (D.D.C. Dec. 23, 1982)).

22        For the purposes of the TRO, the Court assumed it was true that the BIA had absolutely

23  refused to recognize any leadership for the Colony for ten years, so it issued a TRO requiring the

24  BIA to grant interim recognition to some persons or body of persons as the Colony's government

25  having authority to treat with the United States and manage federal benefits on behalf of the

1   Colony and its members, so that the members of the Colony would not be deprived of the

2   benefits of sovereignty while the Indian courts sorted out the present dispute to the final

3   satisfaction of the BIA.  The BIA chose to recognize the Council as consisting of Wasson and

4   Bills, the only surviving members of the last Council it recognized, and who are, incidentally,

5   the only surviving members recognized by the Minnesota Panel.

6          The Court rejects Defendants' arguments that the Court erred as a legal matter; however,

7   Defendants have identified a legitimate procedural issue that Plaintiffs omitted in their pleadings.

8   Defendants wrongly characterize *Goodface* as an outlier case contrary to the generally accepted

9   proposition that federal courts should not interfere in internal tribal affairs.  Defendants cite

10  many cases for the uncontroversial proposition, recognized both by this Court and the *Goodface*

11  court, that federal courts should not delve into tribal politics to sort out the merits of internal

12  disputes, but should await rulings from tribal courts.  This Court noted the principle in the TRO,

13  as it has noted and applied it in other cases. *See Wasson v. Pyramid Lake Paiute Tribe*, --- F.

14  Supp. 2d ----, 2011 WL 769989, at *3 (D. Nev. 2011).  *Goodface* is not to the contrary but

15  represents a distinction: where the dispute is not between tribal factions who ask a federal court

16  to sort out the tribal dispute directly, but between a purported tribal representative and the BIA

17  over a refusal to recognize the purported tribal representative in the face of such a dispute, the

18  BIA abuses its discretion under the APA by refusing to take sides and simply ignoring the tribe

19  altogether until the tribe sorts out the dispute in its own courts or otherwise. *Goodface*, 708 F.2d

20  at 339.  Two other district courts in this Circuit have cited *Goodface* for the proposition that final

21  BIA action refusing to recognize a single tribal leadership is reviewable under the APA, even if a

22  direct foray into tribal law is not permitted. *See Alturas Indian Rancheria v. Salazar*, No. CIV.

23  S-10-1997 LKK/EFB, 2010 WL 4069455, at *6 (E.D. Cal. Oct. 18, 2010) ("Long-standing

24  policy, as well as federal court precedent, require the Department, when faced with an obligation

25  to interact with a governing body during a governance dispute, to temporarily recognize a

1  governing body to interact with."); *Timbisha Shoshone Tribe v. BIA*, No. CIV S-03-404

2  WBS/GGH, 2003 WL 25897083, at *6 n.7 (E.D. Cal. Apr. 10, 2003).

3  This Court noted that it would not delve into the merits of the present dispute (it still does

4  not intend to), and that it expected the BIA to await a ruling by the tribal courts before it granted

5  final recognition. The Court then ruled, based on allegations that the BIA had stood mute for ten

6  years and ignored all requests for recognition while slowly adjudicating them, that under

7  *Goodface* the BIA must give interim recognition to some representative(s) until the tribal courts

8  could sort out the current dispute. An outright refusal to deal with Wasson or any other

9  purported representative would amount to final agency action denying Wasson recognition as the

10  Colony's representative.

11  The Court now has more information, which development is normally expected between

12  the issuance of a TRO and a preliminary injunction hearing, because the opposing party has the

13  ability to present contrary facts in the meantime. The BIA has indeed presented contrary facts

14  that the Complaint and motions for TRO and preliminary injunction omitted. Specifically, the

15  BIA alleges that it is currently adjudicating a three-way dispute over colonial leadership. If it is

16  true that the BIA is currently adjudicating the present dispute, then despite the ability of a court

17  to review the eventual ruling, there may have been no final agency action yet under the APA for

18  this Court to review, and hence no subject matter jurisdiction.

19  Still, the BIA's argument that there is not yet any final agency action is ultimately

20  unconvincing for at least two reasons. First, there is the possibility that there will never be final

21  agency action. In other words, the requirement of any further exhaustion appears futile after a

22  decade of failure to recognize any leadership even in the face of the Minnesota Panel's opinion

23  and the federal courts' recognition of that opinion. *See, e.g.*, *SAIF Corp./Or. Ship v. Johnson*,

24  908 F.2d 1434, 1440–41 (9th Cir. 1990). The BIA's assurances at oral argument that the dispute

25  is currently being adjudicated are therefore not particularly assuring. Second, it is not clear the

1    BIA is addressing the matter appropriately, in any case.  As the BIA itself notes and indeed

2    focuses on in its pleadings, it is not for the federal government to adjudicate disputed tribal

3    leadership according to tribal law. *See* Cohen's Handbook of Federal Indian Law § 5.03[3][c], at

4    411 (2005 ed.) (citing *Wheeler v. DOI*, 811 F.2d 549, 551–52 (10th Cir. 1987)).  But that is

5    precisely what the BIA appears to be doing via the adjudication. (*See* Bowker Decl. ¶ 9, Sept. 9,

6    2011, ECF No. 16-2).  In fact, the BIA bases its argument that there is no federal jurisdiction

7    under the APA precisely upon its assertion that it is still in the process of directly adjudicating

8    the issue that it argues elsewhere it has no business adjudicating, i.e., the colonial leadership

9    dispute.  The last authoritative statement from any tribal court (the Minnesota Panel) was that

10   Wasson and Bills (and three now-deceased persons) comprise the Council.  Therefore, so long as

11   there is no objection from Bills of which the BIA is aware—and the BIA indicated at oral

12   argument that it had no idea where Bills currently resides or can be found—the will of Wasson is

13   presumably the will of the Council under the last authoritative statement from the tribal courts.

14   And if new disputes have arisen since the last tribal court adjudication, then the proper route is

15   not to attempt a direct adjudication but to await adjudication of the new dispute by a tribal court.

16           Just as the BIA should not interfere in tribal self-governance, "courts should not require

17   the Department to act when to do so would interfere with the tribe's right to self-government."

18   *Wheeler*, 811 F.2d at 551 (citing *Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d

19   486, 489 (10th Cir. 1983)).  The Court's limited intervention here is in aid of tribal self-

20   government, not to its detriment.  And the Court need not address tribal law or political disputes

21   directly in order to make these determinations, but need only give effect to the decisions the

22   tribal courts have themselves made, which is quite different.  It is akin to the difference between

23   registering a foreign judgment and interpreting foreign law.  The latter is inappropriate in the

24   Indian law context, but the former is perfectly appropriate.  The Court may, without wading into

25   the merits of tribal law or political disputes, identify that a tribal court has ruled such-and-such

1   and that the BIA must respect that ruling lest it abuse its discretion under the APA.  The Court

2   will therefore preliminarily enjoin the BIA from interfering with activities on colonial land by

3   Wasson and his agents.  Until some tribal court says otherwise or Bills appears and is heard to

4   object (making the Council's vote 1–1), Wasson represents the will of the Council under the

5   Minnesota Panel's ruling.

6        Neither the BIA nor this Court should attempt directly to adjudicate whether the new

7   alleged members have been legitimately elected in the meantime.  If multiple groups are

8   claiming to the BIA to represent the Council due to intervening election disputes, those parties

9   must obtain a tribal judgment in order to have any colorable claim against the leadership as

10  determined by the Minnesota Panel.  From the perspective of the federal government, whether

11  executive or judicial, the Minnesota Panel's ruling is the last word unless and until the

12  Winnemucca Tribal Court or perhaps the Inter-Tribal Court of Appeals of Nevada issues a

13  superseding ruling or Congress intervenes directly by treaty or resolution.  Any cessation of

14  recognition of the Council (as defined by the Minnesota Panel) born of the BIA's perceptions of

15  interceding disputes would amount to an impermissible foray by the BIA into the interpretation

16  of the colonial constitution or dealings in colonial politics.  A case where there had never been

17  any declaration by a tribal court would be more difficult, but here the Court has the Minnesota

18  Panel's ruling, and that panel fortunately was stipulated to by the parties, avoiding any dispute

19  over the legitimacy of the tribal forum itself.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

1

**CONCLUSION**

2      IT IS HEREBY ORDERED that the Motion for Preliminary Injunction (ECF No. 8) is

3  GRANTED in part and DENIED in part.  Counsel for Plaintiffs shall submit a proposed

4  preliminary injunction order consistent with this order and the Court's statements at oral

5  argument.

6      IT IS FURTHER ORDERED that the Motion to Vacate (ECF No. 15) is DENIED.

7      IT IS SO ORDERED.

8      Dated this 12th day of September.

9

10  _____
    ROBERT C. JONES
    United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25